Richard G. Rosenblatt
Drew B. Wixted
**MORGAN, LEWIS & BOCKIUS LLP**
(A Pennsylvania Limited Liability Partnership)
502 Carnegie Center
Princeton, NJ  08540-6241
609.919.6600

*Attorneys for Defendants/Counterclaimants*
*Mark Canha and Cisco Systems, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AVAYA INC.,** | **CIVIL ACTION NO. 10:CV-5881** |
| **Plaintiff,** | |
| **v.** | **COUNTERCLAIMS OF DEFENDANTS MARK CANHA AND CISCO SYSTEMS, INC. AGAINST PLAINTIFF AVAYA, INC.** |
| **MARK CANHA AND CISCO SYSTEMS, INC.,** | **Document Electronically Filed** |
| **Defendants.** | |

Defendants Mark Canha ("Mr. Canha") and Cisco Systems, Inc. ("Cisco") (collectively "Defendants"), by and through their undersigned attorneys, Morgan Lewis & Bockius LLP, hereby file these Counterclaims against Plaintiff Avaya, Inc. ("Plaintiff" or "Avaya"), and, in support thereof, aver as follows:

### NATURE OF THE ACTION

1.    Plaintiff is seeking to enforce a patently overbroad and unreasonable non-competition provision that it obtained through fraudulent, deceptive means.  Plaintiff seeks to enjoin Mr. Canha from working for Cisco, in <u>any</u> capacity, anywhere in the world, for the period of one year, even though Mr. Canha worked for Avaya for only 11 months.  (Plaintiff's Complaint ("Compl."), ¶ 67).  This Honorable Court recently denied Plaintiff's application for a

temporary restraining order, expressing its "grave concerns" about the scope of the non-compete provision, the manner in which Avaya attempted to obtain the restriction, and the overall enforceability of the non-compete provision. Although the Court denied Avaya's application, this lawsuit is still acting like a cloud over Defendants' heads and, for far too long, has deprived Cisco of the full benefit of Mr. Canha's experience and expertise. Accordingly, Cisco and Mr. Canha now petition this Honorable Court pursuant to 28 U.S.C. §§ 2201 and 2202 for a declaration that the non-compete restriction between Plaintiff and Mr. Canha is unenforceable as a matter of law. Specifically, Defendants seek declaratory relief that the non-compete restriction is invalid because Mr. Canha and Avaya did not mutually assent to the restriction, that the non-compete restriction if void *ab initio* because of Avaya's fraud in the factum, and that the restriction is overly broad and unreasonable, and, thus, unenforceable. Mr. Canha also brings this action to obtain relief for Plaintiff's fraudulent conduct in attempting to obtain the non-compete restriction from him in the first place.

2.      This action, along with the corresponding request for both preliminary and permanent injunctive relief, is necessary to protect Defendants from the further irreparable harm they will suffer if Plaintiff is permitted to attempt to enforce the non-compete restriction or otherwise preclude Mr. Canha from working for Cisco.

## PARTIES

3.      Plaintiff Avaya is a corporation organized and existing under the laws of Delaware, with its principal place of business at Basking Ridge, New Jersey. Avaya is a privately held telecommunications company which specializes in corporate unified messaging systems and contact center technology.

4.      Defendant Cisco is a corporation organized and existing under the laws of the State of California and maintains a principal place of business at 170 West Tasman Drive, San Jose, California.  Cisco is a global leader in the communications and information technology industry that develops, manufactures, and sells IP-based networking and other products and services worldwide.

5.      Defendant Mr. Canha resides in the State of Massachusetts.

### FACTUAL BACKGROUND

**A.      Mr. Canha's Extensive Experience In The Communications And Network Solutions Industry**

6.      Mr. Canha is presently employed by Cisco as a Director of Sales and Business Development.  He joined Cisco on August 2, 2010, after leaving Avaya.

7.      Mr. Canha has over 27 years of experience in the communications and network solutions industry.  He has worked in various segments of the industry continuously since 1982.

8.      Throughout Mr. Canha's career, he has worked at several leading technology and communications companies, including IBM/ROLM Systems, MCI, and LightStream, and has approximately twenty (20) years of "operational" experience, which includes market research, sales, strategy development, marketing management, field sales program management, and quality control management.  He also has approximately nine (9) years of industry-focused venture capital/private equity experience, which gives him a unique perspective on the "business" aspects of the communications and network solutions industry.  This is Mr. Canha's second stint at Cisco—he previously worked there from 1995-1998.

9.      Over his professional career, Mr. Canha has developed a wealth of telecommunications, information technology, and network solutions industry know-how and, not surprisingly, has formed a great number of relationships with people within this industry.

**B.      Mr. Canha Joins Avaya In August 2009, But Works There For Only Eleven (11) Months Because He Is Unsatisfied With Avaya**

10.      In 2009, Todd Abbott ("Mr. Abbott"), a former Cisco colleague, contacted Mr. Canha about potentially joining Avaya.

11.      On August 18, 2009, Avaya offered Mr. Canha the position of "Vice President, Worldwide Sales Strategy," reporting directly to Mr. Abbott.

12.      Mr. Canha started almost immediately (within a few days at most) upon receiving Avaya's offer.

13.      However, because of changing business needs, during Mr. Canha's tenure at Avaya, he spent little, if any, time developing "worldwide sales strategy," and, instead, devoted the majority of his time to addressing internal operational issues as they arose.

14.      In early June 2010, Mr. Abbott's employment with Plaintiff was abruptly and unexpectedly terminated.

15.      As a result, Mr. Canha – who was Mr. Abbott's "right hand man" – began to question his role and security at Avaya.  In fact, Mr. Canha learned that there was a possibility of headcount reductions and he was concerned that he could be among those let go.

**C.      Mr. Canha Contacts Cisco About Possible Employment**

16.       Shortly after Mr. Abbott's termination, in July 2010, Mr. Canha contacted a friend and former colleague, Marc Aldrich ("Mr. Aldrich") of Cisco, to explore potential opportunities.

17.      In turn, Mr. Aldrich put Mr. Canha in touch with Michael Glickman ("Mr. Glickman"), an Area Vice President with oversight responsibility for Cisco's sales and sales support for Cisco's United States service provider customers.

18.     Mr. Glickman was looking to hire someone to develop high-level strategies to connect content providers (e.g. ESPN, Disney) with internet service provider customers (Comcast), and develop new business models intended to drive profitability for all parties that help provide content to end-users (providers, aggregators, and distributors).  This position and these duties were far different than anything Mr. Canha did at Avaya.

19.     Mr. Canha was immediately interested in this position because it involved high-level strategy that would draw upon his vast private equity/venture capital investing experience and technological "know-how."

20.     On July 30, 2010, Cisco offered Mr. Canha a position as a Senior Director of Sales and Business Development, and he accepted.

**D.      Mr. Canha Resigns From Avaya And Is Told, For The First Time, Of His Purported Non-Competition Covenant; Mr. Canha Has No Recollection Of Ever Seeing Or Discussing A Non-Compete Covenant.**

21.     On August 1, 2010, Mr. Canha contacted his then Avaya manager, Joel Hackney ("Mr. Hackney"), and advised that he had accepted a position with Cisco.

22.     A short time later, Avaya's Vice President of Human Resources for Avaya, Cindy Fiedelman ("Ms. Fiedelman") contacted Mr. Canha and informed him that he was bound by a non-competition restriction contained within his Stock Option Award Agreement.

23.     Prior to August 1, 2010, no one at Avaya had ever mentioned the existence of a non-compete restriction that would have precluded Mr. Canha from working for a competitor. The only restrictive covenants of which Mr. Canha had been aware pertained to the maintenance of confidentiality and that he could not solicit any customers or employees for twelve months (as set forth expressly in his offer letter from Avaya).

5

24.     Mr. Canha explained to Ms. Fiedelman that the provision would not be an issue because what he was hired to do for Cisco was not in any way in competition with Avaya. Unbeknownst to Mr. Canha, the non-compete provision to which Ms. Fiedelman apparently was referring was far more expansive that that of which Mr. Canha had been aware.

25.     Ms. Fiedelman explained, however, that people at Avaya were very emotional about people leaving Avaya to go to Cisco and she was not sure how management would react or respond.

26.     Ultimately, Mr. Canha learned that the non-competition covenant of which Ms. Fiedelman spoke is Section 3.1, a clause that is buried in an Appendix to Avaya's Equity Incentive Plan and Stock Option Award Agreement.

27.     However, prior to his conversation with Ms. Fiedelman, Mr. Canha does not recall ever seeing the non-compete provision in Section 3.1.

28.     Specifically, Section 3.1 of the Stock Option Award Agreement states:

**3.  Non-Competition and Other Restricted Activity**

3.1   Non-Competition.   ....Further, during the 12-month period immediately following the termination of the Optionee's [Canha] employment for any reason, the Optionee will not work for or provide services to, in any capacity, whether as an employee, independent contractor or otherwise, whether with or without compensation, to any Material Competitor (as defined below).

\* \* \*

5.   Definitions...."Material Competitor" means an entity, or a division or a subsidiary of a multi-division entity or holding company, which engages in business in one or more of the fields in which the Company conducts business and from which the Company derives at least 10% of its annual gross revenues, as determined on the date of the Optionee's termination of employment with the Company or an affiliate, as applicable."

See Equity Incentive Plan and Stock Option Award Agreement, attached hereto as Exhibit A.

29.     The non-compete restriction thus purports to limit Mr. Canha's ability to work, in any capacity whatsoever, for any "competitor" worldwide, for a full, twelve-month period, without any limitation in either geography or scope.

30.     Likewise, Mr. Canha does not recall anyone at Avaya ever advising that a non-compete restriction associated with his Stock Option Award would exceed the scope of that which was contained in his Offer Letter.  In fact, Mr. Canha's Offer Letter specifically referred to non-solicitation provisions potentially being in the Stock Option Award Agreement, but said nothing about any broader terms.

31.     Instead, the only restrictions to which Mr. Canha agreed are those set forth in his Offer Letter from Avaya, which was sent via email by Brian Ricci ("Mr. Ricci"), a human resources representative with Avaya, to Mr. Canha on or about August 18, 2009. See Offer Letter, attached hereto as Exhibit B.

32.     Upon his receipt of the Offer Letter, Mr. Canha read it carefully and made sure that he understood the restrictive covenants Avaya was seeking.

33.     In relevant part, the Offer Letter states:

You further recognize and acknowledge that it is vital for the proper protection of Avaya's legitimate interests that during the term of your Avaya employment and for a period of one (1) year from the termination of your Avaya employment you may not directly or indirectly (i) solicit, induce, or attempt to solicit or induce employees of Avaya or any affiliate of Avaya to terminate their employment with, or otherwise cease their relationship with, Avaya or any affiliate company; or (ii) solicit, induce, hire, or attempt to solicit, induce or hire any employee of Avaya to work or provide services to any third party; or (iii) solicit to divert or take away or attempt to divert or to take away, the business or patronage of any of Avaya's clients, customers or accounts, or prospective clients, customers or accounts.

34.     The Offer Letter also references a grant to Mr. Canha of the option to purchase up to 150,000 shares of Avaya stock.

35.     While the Offer Letter unequivocally states that the terms and conditions of the

Stock Option Award are to be governed by the Equity Incentive Plan, which, according to the

Offer Letter, was attached as "Attachment A," it was in fact not attached to the Offer Letter

presented to Mr. Canha.

36.     Noting the absence of Attachment A, prior to signing the Offer Letter, Mr. Canha

asked several individuals, including Mr. Ricci and Ms. Fiedelman, for a copy of the Equity

Incentive Plan.

37.     Mr. Canha was told, however, that Avaya would send him a copy of those

documents "later," and that it was Avaya's practice not to provide copies until an award was

approved.

38.     No one at Avaya ever suggested to Mr. Canha that there was a more expansive

non-competition provision buried in an Appendix to the Equity Incentive Plan that far exceeded

in scope the restrictive covenants contained in the Avaya Offer Letter.

39.     Additionally, nowhere in the Offer Letter did Avaya ever suggest that Mr. Canha

would be subjected to the non-competition restriction that Avaya is attempting to enforce against

him.

40.     Despite his having asked for a copy of the plan prior to signing his offer letter,

Avaya did not provide Mr. Canha with a copy of the Plan until November 2009, roughly three

months after he began his employment with Avaya.

41.     Mr. Canha never received a hard copy of the Equity Incentive Plan, and instead

received an electronic copy through which he was asked to electronically "accept" the Stock

Option Award Agreement, which he did.

42.     Mr. Canha does not believe that the Stock Option Award Agreement he acknowledged in November, 2009 contained a non-compete provision akin Section 3.1 of the March, 2010document, but cannot be certain.

43.     Mr. Canha is certain that no one at Avaya ever informed him that the Stock Option Award Agreement contained any new or different restrictive covenants over and above that which was set forth in his Offer Letter.

44.     In fact, in February, 2010, Mr. Canha was again presented with an electronic version of the Plan and Stock Option Award Agreement.  Mr. Canha recalls that he was told that there were no changes to the documents, but the strike price upon exercise of the options had been adjusted, and that there were vesting changes that would impact people who had been vesting Avaya options for a longer period of time.  Like before, no one ever informed Mr. Canha that the Stock Option Award Agreement contained any new or different restrictive covenants over and above that which was set forth previously in his Offer Letter.

45.     In March, 2010, Avaya's Shareholder Administration department contacted Mr. Canha and asked him to electronically "accept" the Stock Option Award Agreement again because there was a computer issue and his February acceptance "did not take."  Like before, no one informed Mr. Canha that the Stock Option Award Agreement contained any new or different restrictive covenants over and above that which was set forth in his Offer Letter.

46.     Most notably, when Mr. Canha recounted these facts in opposition to Avaya's recent Motion for Temporary Restraining Order, Avaya did not refute this point and did not submit to the Court copies of the Agreements submitted to Mr. Canha for his acknowledgment in November, 2009 or February, 2010.  Rather, it merely provided to the Court a version that it had Mr. Canha electronically acknowledge in March, 2010.

47.    Again, Mr. Canha did not become aware of the existence of the alleged non-compete restriction until Ms. Fiedelman mentioned it during their telephone conference on August 1, 2010.

48.    Mr. Canha began employment with Cisco on August 2, 2010.

49.    Over two months after Mr. Canha left Avaya and began working at Cisco, Plaintiff initiated this action seeking to enforce the non-compete restriction against Mr. Canha, thereby preventing him from working in any capacity, for any competitor, worldwide until June 30, 2011.

**E.    Governing Law**

50.    The Equity Incentive Plan provides that:

This Agreement and all claims arising out of or based upon this Agreement or relating to the subject matter hereof shall be governed by and construed in accordance with the domestic substantive laws of the State of Delaware without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

See Exhibit A, ¶ 10. Accordingly, this Court's analysis of the non-compete restriction is governed by the law of the State of Delaware.

**COUNT I: DECLARATORY JUDGMENT**
**(By Defendants against Plaintiff)**

51.    Defendants reallege and incorporate Paragraphs 1 through 50 as if fully set forth herein.

52.    A contract will not be enforceable where there is no meeting of the minds as to the terms of the contract, and courts looks to the terms of the parties' written agreement to determine whether mutual assent occurred. Oce North America, Inc. v. Caputo, 416 F.Supp.2d 1321, 1427 (S.D.Fl. 2006). Where, as here, the relevant terms were incorporated by reference

into a written contract, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.  Id.

53.    In addition, where a party was misled as to the contents of the document he signed, a non-compete will be considered void *ab initio*.  Federal Dep. Ins. Co. v. Kewa Metal Salts, Inc., No. 79C-SE-48, 1988 WL 90498, at *1 (Del. Super. Ct. August 17, 1988); MBIA Ins. Corp. v. Royal Indem. Co., 426 F.3d 204, 217 (3d Cir. 2005).

54.    Finally, upon looking to the temporal and geographic restrictions imposed and the "spectrum of activities" prohibited by a non-competition agreement, a court will not enforce an agreement that is more restrictive than an employer's legitimate interests justify or that is oppressive to an employee. See RHIS, Inc. v. Boyce, No. 18924, 2001 WL 1192203, at *6-7 (Del. Ch. Sept. 26, 2001); Delaware Express Shuttle v. Older, No. 19596, 2002 Del. Ch. LEXIS 124, 43-44 (Del. Ch. Oct. 23, 2002).

55.    Mr. Canha did not have knowledge of, or assent to, the non-compete restriction that was incorporated by reference into the Stock Option Award Agreement.  In fact, Mr. Canha was not even aware of its existence until after he resigned from Avaya.

56.    Instead, Avaya misled Mr. Canha by providing him with an Offer Letter that expressly described a restrictive covenant that contained detailed customer and employee "non-solicitation" obligations, but absolutely nothing about not being permitted to work for competitors, let alone for operations of competitors that do not compete with Avaya.

57.    The Offer Letter also inaccurately stated that a copy of the Equity Incentive Plan was attached as Attachment A when, in fact, Avaya attached nothing and refused to provide Mr. Canha with a copy of the attachment.

58.     Additionally, in seeking to prohibit Mr. Canha from working in <u>any</u> capacity, for <u>any</u> competitor, <u>anywhere</u> in the world, Avaya's non-compete restriction lacks any limitation in either geography or scope.

59.     Accordingly, an actual, substantial, and justiciable controversy has arisen and exists between Defendants and Avaya with regard to whether Avaya should be entitled to enforce an invalid non-compete restriction against Mr. Canha.

60.     Defendants request that the Court declare that the non-compete restriction Avaya is seeking to enforce is null and void, and therefore unenforceable for the following reasons:  (i) Mr. Canha and Avaya did not mutually assent to the non-compete restriction; (ii) Avaya obtained the restriction through fraud; and (iii) the scope of the restriction is overbroad and unreasonable. Thus, Avaya is not entitled to any injunctive relief or any other relief based on any alleged violation of this covenant.

Defendants further request that the Court declare that Avaya is hereafter enjoined and restrained from, for its own benefit or for the benefit of any other person, firm, or corporation, enforcing its non-compete restriction against Mr. Canha or taking action to or attempting to preclude or disrupt Mr. Canha from working with Cisco based on the non-compete provision contained at Section 3.1 of the Equity Incentive Plan and Stock Option Award Agreement, attached hereto as Exhibit __ or any other similar agreement.

## COUNT II: FRAUDULENT INDUCEMENT
### (By Mr. Canha against Plaintiff)

61.     Defendants reallege and incorporate Paragraphs 1 through 60 as if fully set forth herein.

62.     As set forth in detail above, Plaintiff fraudulently induced Plaintiff to accept employment with Avaya based on misrepresentations and omissions, including but not limited

to: (i) presenting Mr. Canha with an Offer Letter that contained confidentiality and non-solicitation obligations, but unquestionably did not contain a non-compete restriction; (ii) failing to inform Mr. Canha that the Stock Option Award Agreement contained a non-compete provision; (iii) falsely representing that the Offer Letter contained a copy of the Equity Incentive Plan attached as Attachment A when, in fact, Avaya attached nothing; and (iv) refusing to give Mr. Canha a copy of the Equity Incentive Plan when he request it on numerous occasions.

63.    These representations and/or omissions were material.

64.    Upon information and belief, Plaintiff intended for Mr. Canha to rely upon these representations and/or omissions.

65.    Plaintiff knew or should have known that these representations were false at the time they were made.

66.    Mr. Canha, after careful review of the documents presented to him, justifiably relied upon the representations of Plaintiff in accepting its offer of employment and also in accepting the Stock Option Award Agreement.

67.    As a result of Plaintiff's fraudulent misrepresentations and omission, Mr. Canha has suffered and will continue to suffer damages, including compensatory damages, punitive damages, counsel fees and costs of suit, and any other relief that the Court deems equitable and just.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants pray that this Court enter an Order providing:

A.    That judgment be entered declaring that the non-compete restriction in Mr. Canha's Stock Option Award Agreement is unenforceable as a matter of law;

B.  That judgment be entered declaring that the non-compete restriction is void *ab initio* because of Avaya's fraud in the factum;

C.  That judgment be entered rescinding Mr. Canha's Stock Option Award Agreement;

D.  That judgment be entered declaring that Avaya is enjoined and restrained from enforcing or attempting to enforce the non-compete restriction or otherwise precluding Mr. Canha from working for Cisco;

E.  That any stipulation or other agreement that the parties have entered into which purports to limit Mr. Canha's duties or responsibilities at Cisco is vacated and stricken;

F.  That Mr. Canha is entitled to compensatory damages that are just and fair;

G   That Mr. Canha is entitled to punitive damages in an amount that are just and fair;

H   That Defendants are entitled to costs, including reasonable attorneys' fees, including, but not limited to, for the cost of defending himself against Avaya's action against them; and

I   That Defendants are entitled to such other relief that the Court deems equitable and just.

Respectfully submitted,

/s/ Drew B. Wixted
Richard G. Rosenblatt
Drew B. Wixted
MORGAN, LEWIS & BOCKIUS LLP
502 Carnegie Center
Princeton, N.J. 08540
609.919.6626

Attorneys for Defendants/Counterclaim Plaintiffs
Mark Canha and Cisco Systems, Inc.

Dated: December 7, 2010

EXHIBIT A

Grant Details

**Details of your Grant**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | **You Accepted this grant on 3/17/2010 2:09:38 PM** | |
| Grant Number | Grant Date | Option Price | Grant Type | Total Stock Options Granted | Time Based Award | MoM Based Award |
| SHCO-0557 | 11/19/2009 | | NQ | | REDACTED | |

REDACTED

# SIERRA HOLDINGS CORP.
## AMENDED AND RESTATED 2007 EQUITY INCENTIVE PLAN STOCK OPTION AWARD AGREEMENT

**THIS AWARD AND ANY SECURITIES ISSUED UPON EXERCISE OF THIS OPTION ARE SUBJECT TO RESTRICTIONS ON VOTING AND TRANSFER AND REQUIREMENTS OF SALE AND OTHER PROVISIONS AS SET FORTH IN THE MANAGEMENT STOCKHOLDERS' AGREEMENT.**

**SIERRA HOLDINGS CORP. STRONGLY ENCOURAGES YOU TO SEEK THE ADVICE OF YOUR OWN LEGAL AND FINANCIAL ADVISORS WITH RESPECT TO YOUR AWARD AND ITS TAX CONSEQUENCES.**

### SENIOR VICE PRESIDENT AND VICE PRESIDENT NONSTATUTORY OPTION AGREEMENT

This agreement (the "Agreement") evidences a stock option granted by Sierra Holdings Corp. (the "Company"), to the undersigned (the "Optionee"), pursuant to, and subject to the terms of, the Sierra Holdings Corp. Amended and Restated 2007 Equity Incentive Plan (the "Plan"), which is incorporated herein by reference.

1.    Grant of Option. This Agreement evidences the grant by the Company to the Optionee on the date of grant set forth above ("Date of Grant") of an option (the "Option") to purchase, in whole or in part, on the terms provided herein and in the Plan, the total number of shares of Stock (the "Shares") having an exercise price equal to the Fair Market Value of the Stock on the Date of Grant, in each case as set forth in the table above and subject to adjustment pursuant to Section 7 of the Plan. The Option will vest in accordance with Section 3 below.

The Option evidenced by this Agreement is intended to be a nonstatutory option (that is, an option not described in subsection (b) of Code Section 422).

2.    Meaning of Certain Terms. Except as otherwise defined herein, all capitalized terms used in this Agreement shall have the same meaning as in the Plan. The following terms shall have the following meanings:

(a)    "Beneficiary" means, in the event of the Optionee's death, the beneficiary, in order of succession:

(i)    named in the written designation (in form acceptable to the

Administrator) most recently filed with the Administrator by the Optionee prior to death and not subsequently revoked prior to the death of the Optionee, or

(ii) if there is no such designated beneficiary, the executive or administrator of the Optionee's estate.

If any portion of the Option has been transferred to a Permitted Transferee who is a natural person, and such Permitted Transferee dies while such Option or transferred portion thereof is outstanding, the Option or portion thereof so transferred may thereafter be exercised, to the extent it remains exercisable and subject to such limitations as the Administrator may impose, by the person or persons to whom it passed from the Permitted Transferee according the applicable laws of descent and distribution.

(b) "Merger" has the same meaning as that term is defined in the Management Stockholders' Agreement.

(c) "Option Holder" means the Optionee or, if as of the relevant time the Option has passed to a Beneficiary or Permitted Transferee, the Beneficiary or Permitted Transferee, as the case may be, who holds the Option pursuant to the terms of this Agreement.

(d) "Permitted Transferee" means a transferee of the Option pursuant to a transfer described at Section 6 below.

(e) "vest" means to become exercisable.

3. Vesting; Method of Exercise; Treatment of the Option Upon Cessation of Employment.

(a) Generally. The Option, or each portion thereof, as applicable, shall vest as set forth in the table above and in accordance with the terms of the applicable Schedule(s) attached hereto.

(b) Exercise of the Option. No portion of the Option may be exercised until such portion vests. Each election to exercise any vested portion of the Option shall be subject to the terms and conditions of the Plan and shall be in writing and signed by the Optionee or by the Beneficiary or Permitted Transferee to whom such portion of the Option has passed (or electronically transmitted, to the extent permitted by the Administrator), in each case subject to any restrictions provided under the Plan and the Management Stockholders' Agreement. Each such exercise election must be received by the Company at its principal office and be accompanied by payment in full as provided in the Plan. The purchase price may be paid (i) by cash or check acceptable to the Administrator, or (ii) on a cashless basis under which shares of Stock otherwise deliverable under the Option and having a Fair Market Value equal to the exercise price are withheld

by the Company in accordance with the Plan, or (iii) by such other means, if any, as may be acceptable to the Administrator, or (iv) by any combination of the foregoing permissible forms of payment. In the event that the Option is exercised by a person other than the Optionee, the Company will be under no obligation to deliver Shares hereunder unless and until it is satisfied as to the authority of the Option Holder to exercise the Option. The latest date on which the Option or any portion thereof may be exercised is the 10th anniversary of the Date of Grant, (the "Final Exercise Date"), and if not exercised by such date the Option or any remaining portion thereof will thereupon immediately terminate.

(c)     <u>Treatment of the Option Upon Cessation of Employment</u>. If the Optionee's Employment ceases, the Option to the extent not already vested will be immediately forfeited and any vested portion of the Option will be treated as follows:

(i)     Subject to (ii), (iii), and (iv) below, the Option, to the extent exercisable immediately prior to the cessation of the Optionee's Employment, will remain exercisable until the earlier of (i) 30 days following cessation of Employment or (ii) the Final Exercise Date, and unless previously exercised will thereupon immediately terminate.

(ii)     In the event of cessation of the Optionee's Employment by reason of death, Disability, or Retirement, the Option, to the extent exercisable immediately prior to Optionee's death, Disability, or Retirement, will remain exercisable until the earlier of (i) the first anniversary of the Optionee's death, Disability, or Retirement, or (ii) the Final Exercise Date, and unless previously exercised will thereupon immediately terminate.

(iii)     Except as otherwise set forth in any Schedule(s) to this Agreement, in the event of termination of the Optionee's Employment by the Company without Cause or the Optionee's voluntary termination of Employment for Good Reason, the Option, to the extent exercisable immediately prior to the cessation of the Optionee's Employment, will remain exercisable until the earlier of (i) 90 days following cessation of Employment, or (ii) the Final Exercise Date, and unless previously exercised will thereupon immediately terminate.

(iv)     In the event of cessation of the Optionee's Employment as a result of an act or failure to act constituting Cause, the Option will be treated as having terminated immediately prior to such cessation of Employment.

4.     <u>Share Restrictions, etc</u>. Except as expressly provided herein, the Optionee's rights hereunder and with respect to Shares received upon exercise are subject to the restrictions and other provisions contained in the Management

Stockholders' Agreement.

5.     <u>Legends, etc.</u> Shares issued upon exercise shall bear such legends as may be required or provided for under the terms of the Management Stockholders' Agreement.

6.     <u>Transfer of Option</u>. The Option may only be transferred to a legal representative in the event of the Optionee's incapacity or to one or more transferees permitted under Section 6(a)(3) of the Plan.

7.     <u>Withholding</u>. The exercise of the Option will give rise to "wages" subject to withholding. The Optionee expressly acknowledges and agrees that the Optionee's rights hereunder, including the right to be issued Shares upon exercise, are subject to the Optionee promptly paying to the Company in cash (or by such other means, including but not limited to the withholding of Shares that would otherwise be received upon exercise of the Option if deemed acceptable to the Administrator in its sole discretion, which Shares shall have a Fair Market Value equal to the minimum statutory tax withholding requirements) all taxes required to be withheld. In the event of an exercise of the Option, or a portion of the Option, in connection with a cessation of Employment as result of death, Disability, termination without Cause, or voluntary termination for Good Reason, the Optionee may elect to have shares of Stock held back by the Company in satisfaction of minimum statutory tax withholding requirements. The Optionee also authorizes the Company and its subsidiaries to withhold such amount from any amounts otherwise owed to the Optionee and the Company may so withhold as provided in Section 3(b) above.

8.     <u>Effect on Employment</u>. Neither the grant of the Option, nor the issuance of Shares upon exercise of the Option, shall give the Optionee any right to be retained in the employ of the Company or any of its Affiliates, affect the right of the Company or any of its Affiliates to discharge or discipline such Optionee at any time, or affect any right of such Optionee to terminate his or her Employment at any time.

9.     <u>Other Undertakings</u>. By executing this Agreement, the Optionee also agrees to the terms and conditions set forth in Appendix I, which are incorporated herein by reference and shall survive any exercise, expiration, forfeiture or other termination of this Agreement or the Option issuable hereunder.

10.     <u>Governing Law</u>. This Agreement and all claims arising out of or based upon this Agreement or relating to the subject matter hereof shall be governed by and construed in accordance with the domestic substantive laws of the State of Delaware without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

**Acknowledgement**

The Optionee confirms that he or she has been provided adequate opportunity to review the Option grant awarded to him or her under the Plan, including this Agreement and the Management Stockholders' Agreement.

The Optionee understands that clicking the appropriate box, "Accept" for acceptance or "Reject" for rejection, indicates his or her irrevocable election to accept or reject, as applicable, the terms of the grant as set forth in this Agreement.

By acceptance of the Option, the Optionee agrees to become a party to (or remain, if the Optionee is already a party to), and be bound by the terms of, the Management Stockholders' Agreement.  The Optionee further acknowledges and agrees that (i) this is an electronic agreement, (ii) the signature to this Agreement on behalf of the Company is an electronic signature that will be treated as an original signature for all purposes hereunder and (iii) any such electronic signature shall be binding against the Company and shall create a legally binding agreement when this Agreement is accepted by the Optionee.

Agreed to as of the Date of Grant.

SIERRA HOLDINGS CORP.

By:
Name: Roger Gaston
Title: Sr. Vice President, Human Resources

### Schedule A
### Vesting Schedule for Time-Based Award

The Time-Based Award, unless earlier terminated, forfeited or expired, shall vest as follows:

a.   25% of the total number of Shares subject to the Time-Based Award, on each of the first, second, third, and fourth anniversaries of the Date of Grant, with the last such vesting date falling on the fourth anniversary of the Date of Grant.

b.   In the event of a termination of the Optionee's Employment as a result of death or disability, or by the Company without Cause, for the vesting year in which termination occurs, the Shares subject to the Time-Based Award that were scheduled to vest at the end of such vesting year will vest on a pro-rated basis as follows: one quarter of such Shares that otherwise would have vested at the end of the vesting year had the termination not occurred will vest for each partial or full quarter in which the Optionee was Employed during that vesting year. "Vesting year" means a twelve-month period beginning on the Date of Grant or an anniversary of the Date of Grant, as applicable, and ending on the first anniversary of such beginning date.

c.   In the event of termination of the Optionee's Employment as described in Section 3(c)(iii) of the Agreement, if such termination of Employment occurs within the one-year period following a Change of Control, unless the Time-Based Award shall have been terminated, exercised or exchanged for other current or deferred cash or property in connection with the Change of Control, the Time-Based Award, to the extent outstanding immediately prior to such termination of Employment, shall be treated for all purposes of this Agreement as having vested in full immediately prior to such termination of Employment.

## Schedule B
### Vesting Schedule for Performance-Based Award

Unless earlier terminated, forfeited or expired, the Performance-Based Award shall vest as follows:

a.  50% of the Shares subject to the Performance-Based Award will vest upon receipt by the Majority Stockholders of Cash Proceeds equal to 1.6 times Initial Investment Value and the balance (i.e. the remaining 50%) of the Shares subject to the Performance-Based Award will vest upon receipt by the Majority Stockholders of Cash Proceeds equal to 2 times Initial Investment Value.

d.  In addition, following the fourth anniversary of the Closing Date, if the Stock is then traded on a national securities exchange, 50% of the Shares subject to the Performance-Based Award will vest if, in any full calendar quarter occurring thereafter (i) the Majority Stockholders have received Cash Proceeds of at least 0.8 times their Initial Investment Value and (ii) the combination of the average of the Trading Price of the Stock of any Initial Equity Investment held by the Majority Stockholders (such average Trading Price to be determined using an average of the Trading Price for each Trading Day occurring during such calendar quarter) together with Cash Proceeds received on or prior to such quarterly determination date equals or exceeds 1.6 times the Initial Investment Value. The balance (i.e. the remaining 50%) will vest if, following the fourth anniversary of the Closing Date, the Stock is then traded on a national securities exchange and, in any full calendar quarter occurring thereafter (i) the Majority Stockholders have received Cash Proceeds of at least their Initial Investment Value and (ii) the combination of the average of the Trading Price of the Stock of any Initial Equity Investment held by the Majority Stockholders (such average Trading Price to be determined using an average of the Trading Price for each Trading Day occurring during such calendar quarter) together with Cash Proceeds received on or prior to such quarterly determination date equals or exceeds 2 times the Initial Investment Value.

For purposes of this Schedule B, the following terms shall have the following meanings:

a.  "Cash Proceeds" means, as of any determination date occurring after the Closing Date, the cumulative total of all cash, cash equivalents and Marketable Securities actually received by the Majority Stockholders after the Closing Date and on or before such determination date in respect of the Majority Stockholders' Initial Equity Investment, excluding, for the avoidance of doubt, management, consulting, monitoring, advisory or similar fees paid to affiliates of the Majority Stockholders that are (i) contemplated by the Management Services Agreement dated October 2, 2007 by and among the Company, Sierra Merger Corp., TPG Capital, L.P., and Silver Lake Management Company III, L.L.C. or associated with the termination of such agreement, (ii) customary for the services provided, or (iii) acceptable to the Administrator after consultation with

the Chief Executive Officer.

e.  "Initial Equity Investment" means the shares of Stock issued to the
Majority Stockholders as of October 26, 2007, including any stock,
securities or other property or interests received by the Majority
Stockholders in respect of such shares in connection with any stock
dividend or other similar distribution, stock split or combination of
shares, recapitalization, conversion, reorganization, consolidation, split-
up, spin-off, combination, repurchase, merger, exchange of stock or other
transaction or event that affects the Company's capital stock occurring
after the date of issuance, but not including, for the avoidance of doubt,
any stock or other securities issued to the Majority Stockholders or any of
them in respect of any subsequent investment or capital contribution
made by the Majority Stockholders or any of them.

f.  "Initial Investment Value" means $1,500,000,000.00.

g.  "Majority Stockholders" has the same meaning as the term is used in the
Management Stockholders' Agreement.

h.  "Marketable Securities" means any equity security (other than Stock or
any security issued by the Company in substitution or exchange for such
Stock) that is both (i) of a class that includes equity securities that are
listed on a national securities exchange and (ii) registered under the
Securities Exchange Act of 1934, as amended, in each case as of the
applicable determination date; provided, however, that Marketable
Securities shall not include any such equity securities described above to
the extent that, and only for so long as, the equity securities of such type
or class received by the Majority Stockholders are subject to a contractual
lock-up or similar agreement restricting transferability.  In the event any
equity securities are excluded from the definition of Marketable Securities
pursuant to the immediately preceding proviso, the Administrator, after
consultation with the Company's Chief Executive Officer, will provide, in
connection with the transaction giving rise to the receipt of such equity
securities by the Majority Stockholders, for adjustments with respect to
this Option as the Administrator, after consultation with the Chief
Executive Officer, deems appropriate, including providing for substitute
equity awards, a "cash out" payment (whether or not subject to
restrictions) and any combination thereof, in each case, subject to
substantially the same vesting conditions and other restrictions contained
in this Option.  For purposes of this Agreement, the value of the
Marketable Securities on any "measurement date" (which shall be the
date of initial receipt of Marketable Securities by the Majority
Stockholders, the date any such contractual lockup or similar restriction
expires or the last day of each calendar quarter beginning with the
calendar quarter within which the initial receipt of Marketable Securities
by the Majority Stockholders occurred) shall be equal to the average of
the Trading Price of such Marketable Securities over each of the 45
consecutive Trading Days immediately preceding (and including) such

measurement date; provided, however, that the Administrator, after consultation with the Chief Executive Officer, shall be entitled to make equitable adjustments to such valuation methodology in the event of an extraordinary transaction occurring during any such 45 Trading Day period ending on such measurement date.

i.   "Trading Day" means each business day during such calendar quarter in which the Trading Price of the Stock or Marketable Securities, as applicable, is reported by the principal securities exchange or, solely in the case of Stock, furnished by a member of the Financial Industry Regulatory Authority, Inc. ("FINRA") selected by the Board or determined by the Board in good faith.

j.   "Trading Price" means (i) the closing price on such day of a share of Stock or Marketable Securities, as applicable, as reported on the principal securities exchange on which shares of Stock or Marketable Securities, as applicable, are then listed or admitted to trade or (ii) if not so reported, as furnished by any member of FINRA selected by the Board.  In the event that the price of a share of Stock is not so reported or furnished, the Trading Price will be determined by the Board in good faith.

## APPENDIX I

### Non-Disclosure, IP Assignment, Non-Solicitation and Non-Competition

By executing the Award Agreement, the Optionee acknowledges the importance to Avaya Inc. and its Affiliates, existing now or in the future (hereinafter referred to collectively as the "Company") of protecting its confidential information and other legitimate business interests, including without limitation the valuable trade secrets and good will that it has developed or acquired. The Optionee further acknowledges that the Company is engaged in a highly competitive business, that its success in the marketplace depends upon the preservation of its confidential information and industry reputation, and that obtaining agreements such as this one from its employees is reasonable. The Optionee undertakes the obligations in this Appendix I in consideration of the Optionee's initial and/or ongoing employment with the Company, the Optionee's opportunity to receive an Award pursuant to the Sierra Holdings Corp. Amended and Restated 2007 Equity Incentive Plan, the Optionee's being granted access to trade secrets and other confidential information of the Company, and for other good and valuable consideration, the receipt and sufficiency of which the Optionee acknowledges.

1. **Loyalty and Conflicts of Interest**

   1.1. <u>Exclusive Duty</u>. During his or her employment, the Optionee will not engage in any other business activity except as permitted by the Company's Code of Conduct.

   1.2. <u>Compliance with Company Policy</u>. The Optionee will comply with all policies, practices and procedures of the Company which the Company conveys to the Optionee, as these may be implemented and/or changed by the Company from time to time. Without limiting the generality of the foregoing, the Optionee acknowledges that the Company may from time to time have agreements with other Persons which impose obligations or restrictions on the Company regarding Intellectual Property, as defined below, created during the course of work under such agreements and/or regarding the confidential nature of such work. The Optionee will comply with and be bound by all such obligations and restrictions which the Company conveys to him or her and will take all actions necessary (to the extent within his or her power and authority) to discharge the obligations of the Company under such agreements.

2. **Confidentiality**

   2.1. <u>Nondisclosure and Nonuse of Confidential Information</u>. All Confidential Information, as defined below, which the Optionee creates or has access to as a result of his or her employment and other associations with the Company is and shall remain the sole and exclusive property of the Company. The Optionee will never, directly or indirectly, use or disclose any Confidential Information, except (a) as required for the proper performance of his or her regular duties for the Company, (b) as expressly authorized in writing in advance by the Company, (c) as required by applicable law or regulation, (d) to his or her attorneys, accountants, consultants, and other professionals to the extent necessary to

3.1. <u>Non-Competition</u>. During his or her employment the Optionee will not, directly or indirectly, compete with the Company, anywhere in the world, whether as an owner, partner, investor, consultant, employee or otherwise. Further, during the 12-month period immediately following the termination of the Optionee's employment for any reason, the Optionee will not work for or provide services to, in any capacity, whether as an employee, independent contractor or otherwise, whether with or without compensation, to any Material Competitor (as defined below). The foregoing shall not prevent: (i) passive ownership by the Optionee of no more than two percent (2%) of the equity securities of any publicly traded company; or (ii) the Optionee's providing services to a division or subsidiary of a multi-division entity or holding company, so long as no division or subsidiary to which the Optionee provides services is a Material Competitor, and the Optionee does not otherwise engage in competition on behalf of the multi-division entity or any competing division or subsidiary thereof.

3.2. <u>Good Will</u>. Any and all good will which the Optionee develops during his or her employment with any of the customers, prospective customers, subcontractors or suppliers of the Company shall be the sole, exclusive and permanent property of the Company, and shall continue to be such after termination of the Optionee's employment, howsoever caused.

3.3. <u>Non-Solicitation of Customers</u>. During his or her employment and during the 12-month period immediately following the termination of such employment for any reason, the Optionee will not, directly or indirectly, (a) solicit, encourage or induce any customer of the Company to terminate or diminish in any substantial respect its relationship with the Company; or (b) seek to persuade or induce any such customer or prospective customer of the Company to conduct with anyone else any substantial business or activity which such customer or prospective customer conducts or could conduct with the Company; provided that the restrictions in (a) and (b) shall apply (i) only with respect to those Persons who are or have been a customer of the Company at any time within the immediately preceding one-year period or whose business has been solicited on behalf of the Company by any of its officers, employees or agents within said one-year period, other than by form letter, blanket mailing or published advertisement, and (ii) only if the Optionee has performed work for such Person during his or her employment with the Company or has been introduced to, or otherwise had contact with, such Person as a result of his or her employment or other associations with the Company or has had access to Confidential Information which would assist in the solicitation of such Person. The foregoing restrictions shall not apply to general solicitation or advertising, including through media and trade publications.

3.4. <u>Non-Solicitation/Non-Hiring of Employees and Independent Contractors</u>. During his or her employment and for the 12-month period immediately following the termination of such employment for any reason, the Optionee will not, and will not assist anyone else to, (a) hire or solicit for hiring any employee of the Company or seek to persuade or induce any employee of the Company to discontinue employment with the Company, or (b) hire or engage any

obtain their services in connection with monitoring his or her investment in the Company (provided they agree not to disclose such Confidential Information to others, except as authorized by this Section 2.1), (g) to any prospective purchaser of any shares from him or her (at a time when such transfer is permissible under the terms of the Management Stockholders' Agreement and other applicable agreements), so long as such prospective purchaser agrees to be bound by the provisions of this Section 2.1 and to use such Confidential Information solely for purposes of evaluating a possible investment in the Company, or (f) as may be reasonably determined by the Optionee to be necessary in connection with the enforcement of his or her rights in connection with this Appendix I. This restriction shall continue to apply after the termination of the Optionee's employment or this Appendix I, howsoever caused. The Optionee shall furnish prompt notice to the Company of any required disclosure of Confidential Information sought pursuant to subpoena, court order or any other legal process or requirement, and shall provide the Company a reasonable opportunity to seek protection of the Confidential Information prior to any such disclosure, to the greatest extent time and circumstances permit.

2.2. Use and Return of Documents. All documents, records and files, in any media of whatever kind and description, relating to the business, present or otherwise, of the Company and any copies (including without limitation electronic), in whole or in part, thereof (the "Documents" and each individually, a "Document"), whether or not prepared by the Optionee, shall be the sole and exclusive property of the Company. Except as required for the proper performance of the Optionee's regular duties for the Company or as expressly authorized in writing in advance by the Company, the Optionee will not copy any Documents or remove any Documents or copies or derivatives thereof from the premises of the Company. The Optionee will safeguard, and return to the Company immediately upon termination of employment, and at such other times as may be specified by the Company, all Documents and other property of the Company, and all documents, records and files of its customers, subcontractors, vendors and suppliers ("Third-Party Documents" and each individually a "Third-Party Document"), as well as all other property of such customers, subcontractors, vendors and suppliers, then in the Optionee's possession or control. Provided, however, if a Document or Third-Party Document is on electronic media, the Optionee may, in lieu of surrender of the Document or Third-Party Document, provide a copy on electronic media (e.g., a properly formatted diskette) to the Company and delete and overwrite all other electronic media copies thereof. Upon request of any duly authorized officer of the Company, the Optionee will disclose all passwords necessary or desirable to enable the Company to obtain access to the Documents and Third-Party Documents. Notwithstanding any provision of this Section 2.2 to the contrary, the Optionee shall be permitted to retain copies of all Documents evidencing his or her hire, equity and other compensation rate and benefits, this Appendix I, and any other agreements between the Optionee and the Company that the Optionee has signed.

3. **Non-Competition and Other Restricted Activity**

independent contractor providing services to the Company, or solicit, encourage or induce any independent contractor providing services to the Company to terminate or diminish in any substantial respect its relationship with the Company. For the purposes of this Appendix I, an "employee" or "independent contractor" of the Company is any person who is or was such at any time within the preceding six-month period. The foregoing restrictions shall not apply to general solicitation or advertising, including through media, trade publications and general job postings.

3.5. Notice of New Address and Employment. During the 12-month period immediately following the termination of his or her employment for any reason, the Optionee will provide the Company with pertinent information concerning each new job or other business activity in which the Optionee engages or plans to engage during such 12-month period as the Company may reasonably request in order to determine the Optionee's continued compliance with his or her obligations under this Appendix I. The Optionee shall notify his or her new employer(s) of the Optionee's obligations under this Appendix I, and hereby consents to notification by the Company to such employer(s) concerning his or her obligations under this Appendix I. The Company shall treat any such notice and information as confidential, and will not use or disclose the information contained therein except to enforce its rights hereunder.

3.6. Acknowledgement of Reasonableness: Remedies. In signing the Award Agreement, the Optionee gives the Company assurance that the Optionee has carefully read and considered all the terms and conditions hereof. The Optionee acknowledges without reservation that each of the restraints contained herein is necessary for the reasonable and proper protection of the good will, Confidential Information and other legitimate business interests of the Company, that each and every one of those restraints is reasonable in respect to subject matter, length of time and geographic area; and that these restraints will not prevent the Optionee from obtaining other suitable employment during the period in which he or she is bound by them. The Optionee will never assert, or permit to be asserted on the Optionee's behalf, in any forum, any position contrary to the foregoing. Were the Optionee to breach any of the provisions of this Appendix I, the harm to the Company would be irreparable. Therefore, in the event of such a breach or threatened breach, the Company shall, in addition to any other remedies available to it, have the right to obtain preliminary and permanent injunctive relief against any such breach or threatened breach without having to post bond. Without limiting the generality of the foregoing, in the event of the Optionee's breach of any of the provisions of this Appendix I, the Company shall have the immediate right to call and repurchase any shares of stock and any stock options that have been awarded to the Optionee by the Company other than Invested Equity (as defined in the Management Stockholders' Agreement), at a purchase price that is the lesser of cost or fair market value, pursuant to the call procedures set forth in the Management Stockholders' Agreement.

3.7. In the event that any provision of this Appendix I shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range

of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law. The 12-month period of restriction set forth in Sections 3.1, 3.3 and 3.4 of this Appendix I shall be tolled, and shall not run, during any period of time in which the Optionee is in violation of the terms thereof, in order that the Company shall have the agreed-upon temporal protection recited herein.

3.8. <u>Consent to Jurisdiction</u>. In the event of any alleged breach of this Appendix I, the Optionee consents and submits to the jurisdiction of the federal and state courts in and of the State of New Jersey, and of the federal and state courts in and of the state in which the Optionee is then employed. The Optionee will accept service of process by registered or certified mail or the equivalent directed to his or her last known address on the books of the Company, or by whatever other means are permitted by such court.

3.9. <u>Limited Exception for Attorneys</u>. Insofar as the restrictions set forth in this Section 3 prohibit the solicitation, inducement or attempt to hire a licensed attorney who is employed at the Company, they shall not apply if the Optionee is a licensed attorney <u>and</u> the restrictions contained herein are illegal, unethical or unenforceable under the laws, rules and regulations of the jurisdiction in which the Optionee is licensed as an attorney.

4. **Intellectual Property**

4.1. In signing the Award Agreement, the Optionee hereby assigns and shall assign to the Company all of his or her right, title and interest in and to all inventions, discoveries, improvements, ideas, mask works, computer or other apparatus programs and related documentation, and other works of authorship (hereinafter each designated "Intellectual Property"), whether or not patentable, copyrightable or subject to other forms of protection, made, created, developed, written or conceived by the Optionee during the period of his or her employment, whether during or outside of regular working hours, either solely or jointly with another, in whole or in part, either: (a) in the course of such employment, (b) relating to the actual or anticipated business or research development of the Company, or (c) with the use of company time, material, private or proprietary information, or facilities.

4.2. The Optionee will, without charge to the Company, but at its expense, execute a specific assignment of title to the Company and do anything else reasonably necessary to enable the Company to secure a patent, copyright or other form of protection for said Intellectual Property anywhere in the world.

4.3. The Optionee acknowledges that the copyrights in Intellectual Property created with the scope of his or her employment belong to the Company by operation of law.

4.4. The Optionee has provided to the Administrator a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by the Optionee prior to his or her employment with the

Company, which belong to the Optionee and which are not assigned to the Company hereunder (collectively referred to as "Prior Inventions"); and, if no such list is provided, the Optionee represents and warrants that there are no such Prior Inventions.

## 5. Definitions

Words or phrases which are initially capitalized or are within quotation marks shall have the meanings provided in this Section 5 and as provided elsewhere in this Appendix I. For purposes of this Appendix I, the following definitions apply:

"Affiliates" means all persons and entities directly or indirectly controlling, controlled by or under common control with the Company, where control may be by management authority, contract or equity interest.

"Confidential Information" means any and all information of the Company, whether or not in writing, that is not generally known by others with whom the Company competes or does business, or with whom it plans to compete or do business, and any and all information, which, if disclosed, would assist in competition against the Company, including but not limited to (a) all proprietary information of the Company, including but not limited to the products and services, technical data, methods, processes, know-how, developments, inventions, and formulae of the Company, (b) the development, research, testing, marketing and financial activities and strategic plans of the Company, (c) the manner in which the Company operates, (d) its costs and sources of supply, (e) the identity and special needs of the customers, prospective customers and subcontractors of the Company, and (f) the people and organizations with whom the Company has business relationships and the substance of those relationships. Without limiting the generality of the foregoing, Confidential Information shall specifically include: (i) any and all product testing methodologies, product test results, research and development plans and initiatives, marketing research, plans and analyses, strategic business plans and budgets, and technology grids; (ii) any and all vendor, supplier and purchase records, including without limitation the identity of contacts at any vendor, any list of vendors or suppliers, any lists of purchase transactions and/or prices paid; and (iii) any and all customer lists and customer and sales records, including without limitation the identity of contacts at purchasers, any list of purchasers, and any list of sales transactions and/or prices charged by the Company. Confidential Information also includes any information that the Company may receive or has received from customers, subcontractors, suppliers or others, with any understanding, express or implied, that the information would not be disclosed. Notwithstanding the foregoing, Confidential Information does not include information that (A) is known or becomes known to the public in general (other than as a result of a breach of Section 2 hereof by the Optionee), (B) is or has been independently developed or conceived by the Optionee without use of the Company's Confidential Information or (C) is or has been made known or disclosed to the Optionee by a third party without a breach of any obligation of confidentiality such third party may have to the Company of which the Optionee is aware.

"Material Competitor" means an entity, or a division or subsidiary of a multi-division entity or holding company, which engages in business in one or more of the fields in which the Company conducts business and from which the Company derives at least 10% of its annual gross revenues, as determined on the date of the Optionee's termination of employment with the Company or an affiliate, as applicable.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust and any other entity or organization, other than the Company.

6.   **Compliance with Other Agreements and Obligations**

The Optionee represents and warrants that his or her employment by the Company and execution and performance of the Award Agreement, including this Appendix I, will not breach or be in conflict with any other agreement to which the Optionee is a party or is bound, and that the Optionee is not now subject to any covenants against competition or similar covenants or other obligations to third parties or to any court order, judgment or decree that would affect the performance of the Optionee's obligations hereunder or the Optionee's duties and responsibilities to the Company, except as disclosed in writing to the Company no later than the time an executed copy of the Award Agreement, including this Appendix I, is returned by the Optionee.  The Optionee will not disclose to or use on behalf of the Company, or induce the Company to use, any proprietary information of any previous employer or other third party without that party's consent.

7.   **Entire Agreement; Severability; Modification**

With respect to the subject matter hereof, this Appendix I sets forth the entire agreement between the Optionee and the Company, and, except as otherwise expressly set forth herein, supersedes all prior and contemporaneous communications, agreements and understandings, written or oral, regarding the same.  Provided, however, this Appendix I shall not terminate or supersede any obligations the Optionee may have pursuant to any other agreement or under applicable law with respect to confidentiality, non-competition, non-solicitation, assignment of rights to intellectual property or the like.  Moreover, for the avoidance of doubt, nothing in this Agreement is intended or shall be construed to affect in any way rights and obligations arising pursuant to the Management Stockholders' Agreement.  In the event of conflict between this Appendix I and any prior agreement between the Optionee and the Company with respect to the subject matter hereof, this Appendix I shall govern.  The provisions of this Appendix I are severable, and no breach of any provision of this Appendix I by the Company, or any other claimed breach of contract or violation of law, shall operate to excuse the Optionee's obligation to fulfill the requirements of Sections 2, 3 and 4 hereof.  No deletion, addition, marking, notation or other change to the body of this Appendix I shall be of any force or effect, and this Appendix I shall be interpreted as if such change had not been made.  This Appendix I may not be

modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by the Optionee and an expressly authorized officer of the Company. If any provision of this Appendix I should, for any reason, be held invalid or unenforceable in any respect, it shall not affect any other provisions, and shall be construed by limiting it so as to be enforceable to the maximum extent permissible by law. Provisions of this Appendix I shall survive any termination if so provided in this Appendix I or if necessary or desirable to accomplish the purpose of other surviving provisions. It is agreed and understood that no changes to the nature or scope of the Optionee's employment relationship with the Company shall operate to extinguish the Optionee's obligations hereunder or require that a new agreement concerning the subject matter of this Appendix I be executed.

**8. Assignment**

Neither the Company nor the Optionee may make any assignment of this Appendix I or any interest in it, by operation of law or otherwise, without the prior written consent of the other; provided, however, the Company may assign its rights and obligations under this Appendix I without the Optionee's consent (a) in the event that the Optionee is transferred to a position with one of the Company's Affiliates or (b) in the event that the Company shall hereafter effect a reorganization, consolidate with, or merge into any Person or transfer to any Person all or substantially all of the business, properties or assets of the Company or any division or line of business of the Company with which the Optionee is at any time associated. This Appendix I shall inure to the benefit of and be binding upon the Optionee and the Company, and each of their respective successors, executors, administrators, heirs, representatives and permitted assigns.

**9. At-Will Employment**

This Appendix I does not in any way obligate the Company to retain the Optionee's services for a fixed period or at a fixed level of compensation; nor does it in any way restrict the Optionee's right or that of the Company to terminate the Optionee's employment at any time, at will, with or without notice or cause.

**10. Successors**

The Optionee consents to be bound by the provisions of this Appendix I for the benefit of the Company, and any successor or permitted assign to whose employ the Optionee may be transferred, without the necessity that a new agreement concerning the subject matter or this Appendix I be re-signed at the time of such transfer.

**11. Acknowledgement of Understanding**

In signing the Award Agreement, the Optionee gives the Company assurance that the Optionee has read and understood all of its terms; that the Optionee has had a

full and reasonable opportunity to consider its terms and to consult with any person of his or her choosing before signing; that the Optionee has not relied on any agreements or representations, express or implied, that are not set forth expressly in the Award Agreement, including this Appendix I; and that the Optionee has signed the Award Agreement knowingly and voluntarily.

LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP

| TITLE | DATE | IDENTIFYING NUMBER OR BRIEF DESCRIPTION |
|---|---|---|

# <u>EXHIBIT B</u>

| | |
|---|---|
| **From:** | Ricci, Brian (Brian) [bricci@avaya.com] |
| **Sent:** | Tuesday, August 18, 2009 7:31 PM |
| **To:** | Mark Canha |
| **Cc:** | Abbott, Todd A. (Todd); Fiedelman, Cindy A (Cindy); Ricci, Brian (Brian) |
| **Subject:** | Avaya Offer |
| **Attachments:** | Mark Canha Exec Offer.pdf; 2009 VP Benefits offer letter summary April 09.pdf |

Congratulations Mark!

Attached is your offer letter along with the VP benefits overview.   We are working with a tight on-boarding window, so please sign and fax the offer letter back tomorrow morning.  This way, we can lock down on everything for a smooth start on Monday.

Please give me a call any time tonight if you have questions.

All the best

Brian Ricci | **AVAYA** | Staffing Manager | 908 953 4384 | fax 908 953 3299 | bricci@avaya.com  211 Mt. Airy Road |
Basking Ridge, NJ 07920 | www.avaya.com | Avaya Careers

1



Avaya Inc.
211 Mt. Airy Road
Basking Ridge, NJ 07920 USA

August 18, 2009

Mark Canha
362 Commonwealth Ave
Boston, MA  02115

Dear Mark,

It gives me great pleasure to offer you a Vice President position in Avaya Inc.  In addition to confirming my offer, this letter sets out the terms and conditions of your employment and outlines the current major features of Avaya's compensation and benefit plans, programs and practices under which you will be covered.

**Assumption of Duties:**  Effective on or about August 24th, 2009 you will assume the role of **VP Worldwide Sales Strategy**, reporting to me.  Your office location will be Virtual Office.

**Total Target Cash Compensation**:  Your total target cash compensation will be **$450,000.** Your pay mix will be 60/40 and will consist of Base Salary and Target Incentive.

> **Base Salary:**  Your initial annual base salary will be **$270,000** per year, payable weekly.

> **Target Incentive Compensation:**  Based on your annual sales compensation pay mix, your annual incentive compensation target will be **40%** of your total target cash compensation, or **$180,000**. Note that there is the ability to exceed your target, and there is no cap on the target incentive amount.  Your target incentive will be paid either on a monthly or quarterly basis in accordance with your specific sales compensation plan.

**Non-Recoverable Draw**
You will be paid a 3 month non-recoverable draw starting September 1, 2009 at a rate of 100% of your Target Incentive.  This will be paid one month in arrears.

**Stock Option Grant:**  Subject to approval by our Board of Directors, you will be awarded an option to purchase **150,000** shares of common stock of Sierra Holdings Corp., the parent company of Avaya (See Attachment A).  This award will consist of:

> o  **97,500** shares, where 25% vests after the first year and the remaining shares vest in equal increments each quarter over the following three years, with all shares having vested by the fourth anniversary of the date of grant; and

> o  **26,250** shares, where 25% vests after each year for four years if Avaya's financial performance meets defined EBITDA targets (net income adjusted for certain items, including but not limited to interest, taxes, depreciation and amortization); and

Mark Canha - Page 2

- o **26,250** shares, where the amount of shares vesting depends on the return Avaya's majority stockholders receive on their initial investment in Avaya.

The specific terms of your award are contained in the Amended and Restated Sierra Holdings Corp. 2007 Equity Incentive Plan and in your individual award agreements, which exclusively control your stock options and supersede any other written or oral representations concerning your options, including this letter. You will receive a copy of the plan and the agreements after your award has been approved. You must be an employee of Avaya on the vesting dates specified in your award agreements to receive your award.

**Employee Benefit Plans:  Attachment B** is a summary of benefits available to you under Avaya's Executive and general employee benefit plans. For most plans, you will be covered immediately from date of hire.

**Confidentiality of Agreement:**  It is agreed and understood that you will not talk about, write about or otherwise disclose the terms or existence of this letter or any fact concerning its negotiation or implementation. You may, however, discuss the contents of this letter with your family, legal and/or financial counselor and as otherwise required by law.

**Contingency of Offer**:  This offer of employment is contingent upon the successful completion of reference checks, a background check and a mandatory drug screen. A positive drug screen will automatically result in rescission of this offer. This offer is also contingent upon Avaya Legal's review of any non-compete / non-solicit agreements related to this offer. Any such agreements should be disclosed and provided as soon as possible, but no later than fifteen (15) calendar days of the date of this letter. Please note that by accepting this offer, you certify that you have no restrictions under any agreement of this type that would impact this assignment at Avaya.

**Benefit and Incentive Plan Terms:**  The benefit and incentive plans, programs and practices briefly outlined in this letter, reflect their current provisions. Payments and benefits under these plans, programs and practices, as well as other payments referred to in this letter are subject to IRS rules and regulations with respect to withholding, reporting, and taxation, and will not be grossed-up unless specifically stated. The Company reserves the right to discontinue or modify any compensation, incentive, benefit, perquisite plan, program or practice at its sole discretion and without prior notice. Moreover, the very brief summaries contained herein are subject to the written terms of such plans, programs and practices, which supersede any other written or oral representations concerning such plans, programs and practices, including this letter.

For purposes of the Executive and employee benefits plans, the definition of includable compensation is set forth in the respective plans, and may be amended or modified at any time and without prior notice. No other compensation and payments reflected in this offer are included in the calculation of any employee or Executive benefits. You may consult with the respective summary plan descriptions, which are available on request, for specific plan information.

**Proprietary Information:**  By acceptance of this offer, you agree that (1) no trade secret or proprietary information belonging to any of your previous employers will be disclosed or used by you at the Company, and that no such information, whether in the form of documents, memoranda, software, drawings, etc. will be retained by you or brought with you to Avaya other than those items explicitly permitted by your previous employers, and (2) you have brought to Avaya's attention and provided it with a copy of any agreement which may impact your future employment at Avaya, including non-disclosure, non-competition, non-solicitation,

Mark Canha - Page 3

invention assignment agreements or agreements containing future work restrictions, and that you certify that you have no restrictions under any agreement of this type that would impact this assignment at Avaya.

**Post Employment Responsibilities and Non-Solicitation:** Your signature on this offer letter will also show you understand and agree that while employed in your position at Avaya you will have access to highly confidential and proprietary Company information and trade secrets ("Proprietary Information," as described herein) and the use, misappropriation or disclosure of Proprietary Information would cause irreparable injury to Avaya; and it is essential to the protection of Avaya's good will and to the maintenance of Avaya's competitive position that Proprietary Information be kept secret and that you not disclose Proprietary Information to others or use any Proprietary Information to your own advantage or the advantage of any third parties.  For purposes of this letter, the term "Proprietary Information" shall include any and all information, in any form whatsoever, including but not limited to, hard copy, computer floppy diskette, CD, CD-ROM drive, information retained in electronic storage, or other information storage means, relating to Avaya's technology; techniques; processes; tools; research and development; market research, data and strategy; and, information relating to sales, pricing and customers, including customer-specific sales information, pricing policies and strategies.

You further recognize and acknowledge that it is vital for the proper protection of Avaya's legitimate interests that during the term of your Avaya employment and for a period of one (1) year from the termination of your Avaya employment you may not directly or indirectly (i) solicit, induce, or attempt to induce employees of Avaya or any affiliate of Avaya to terminate their employment with, or otherwise cease their relationship with, Avaya or any affiliate company; or (ii) solicit, induce, hire or attempt to solicit, induce or hire any employee of Avaya to work or provide services to any third party; or (iii) solicit to divert or take away or attempt to divert or to take away, the business or patronage of any of Avaya's clients, customers or accounts, or prospective clients, customers or accounts.

You further agree that if you violate the terms of the immediately preceding two paragraphs of this offer letter, you may cause harm or injury to Avaya which may not be calculable or remedial by way of monetary damages, you understand and acknowledge that Avaya may initiate an action at law or in equity to prevent you from engaging in any conduct which is in violation of the immediately preceding paragraph of this offer letter, including seeking injunctive relief against you.  Of course nothing in this offer letter shall prohibit Avaya from seeking monetary damages, including costs and reasonable attorneys' fees, as a result of your violation.

If any restriction set forth in this Section is found by a court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend over the maximum period of time, range of activities or geographic areas as to which it may be enforceable.

You understand and agree that the restrictions contained in this Section are necessary for the protection of the business and goodwill of Avaya and are expressly considered by you to be reasonable for such purpose.

There may be other benefits at Avaya that include certain non-solicitation obligations, e.g. equity grants, that are not meant to conflict with this offer letter.  In case of any conflict between the provisions of this letter and the provisions of any other applicable benefit plan,

Mark Canha - Page 4

program or agreement in which you participate, the obligations set forth in such benefit plan, program or agreement shall govern.

**Employment At-Will:** This letter is neither an express nor implied contract for continued employment or employment for a specific length of time. Your employment with Avaya will be "At-Will." This means that you have the right to terminate your employment at any time and for any reason. Likewise, Avaya may terminate your employment at any time and for any reason.

**Prior Representation:** By acceptance of this offer you further agree that this offer supersedes and completely replaces any prior oral or written communications or representations concerning or relating to your employment with Avaya.

If you agree to the foregoing terms and conditions of employment, and affirm that there are no agreements or other impediments that would prevent you from providing exclusive service to Avaya, **please sign this letter by August 19th** in the space provided below. Also, in order to expedite the background check process, please complete the attached Background Verification Procedure forms If you have access to a fax machine, please fax the signed letter and completed forms to Brian Ricci of our Executive Staffing Group at (908) 953-3299 (private fax), and mail the original executed copies in the attached envelope.

Mark, I feel the package we have developed for you is attractive and anticipates that you will make a critical contribution to Avaya. As a Company, we have never been better positioned to take full advantage of the opportunities for growth and success in the marketplace. I look forward to having you join us. If you have any questions, please do not hesitate to call me or Brian Ricci at (908) 953-4384.

Sincerely,

_____
Todd Abbott
SVP and President, Field Operations

_____                    _____
Acknowledged and Agreed to:                          Date
Mark Canha